ROGERS, Circuit Judge.
Tony Von Carruthers appeals the district court's judgment denying his petition for a writ of habeas corpus. A Tennessee jury convicted Carruthers in 1996 of three counts of first-degree, premeditated murder and imposed a death sentence for each of the three murder convictions. The Tennessee Court of Criminal Appeals and the Tennessee Supreme Court affirmed the convictions and sentences on direct appeal. After the state courts denied Carruthers postconviction relief, he filed a petition for a writ of habeas corpus with the district court, arguing, among other things, that he was denied counsel at critical stages of the proceedings in violation of United States v. Cronic , 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), when the trial court granted his appointed counsel's motion to withdraw and ordered Carruthers to proceed pro se, that the trial court violated his Sixth Amendment right to counsel when it ordered him to proceed pro se, and that he was not competent to stand trial or to represent himself. The district court denied Carruthers's petition, and this court granted a certificate of appealability on these three issues. The district court correctly denied relief, because Carruthers has procedurally defaulted his Cronic and competency claims, and the Tennessee Supreme Court's decision that Carruthers forfeited his right to counsel was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.
I.
A Tennessee jury convicted Carruthers of three counts of first-degree, premeditated murder in 1996. State v. Carruthers , 35 S.W.3d 516, 524 (Tenn. 2000). The facts of the underlying crimes are relevant to this appeal only as background. In short, the prosecution introduced evidence at trial to show that, in February of 1994, Carruthers and an accomplice, James Montgomery, *277 assaulted two men and a woman, robbed them, then buried the three alive. See id. at 524-31. The victims' bodies were found buried in a cemetery in Memphis, Tennessee about a week after they had disappeared. Id. at 524. The jury found that the aggravating circumstances surrounding Carruthers's crimes outweighed the mitigating circumstances beyond a reasonable doubt and imposed a death sentence for all three murder convictions. Id. at 531-32.
A.
Carruthers's interactions with his appointed counsel leading up to trial, which ultimately resulted in his representing himself during the capital murder trial, are most relevant to this appeal. These facts, as recited by the Tennessee Supreme Court, are:[1]
Carruthers' family initially retained AC Wharton, Jr., to represent him. Wharton was allowed to withdraw on March 19, 1994, because of a conflict of interest. On May 31, 1994, the trial court appointed Larry Nance to represent Carruthers.... At a hearing held on July 15, 1994, the trial court scheduled a pre-trial motions hearing for September 30, 1994 and set the case for trial on February 20, 1995. Carruthers was present at this hearing and asked the trial court, "I'd like to know why this is being dragged out like this. I asked Mr. Nance if we can go forward with a motion of discovery and he's asking for a reset. And I'd like to know why." Nance informed the court that he was planning to visit the prosecutor's office later in the week to review the discoverable materials and evidence. The trial judge then advised Carruthers in pertinent part as follows:
[G]iven the fact that the trial isn't until February, we're setting the next Court date in September for the arguing of motions. Between now and September, your attorney and the attorneys representing your two co-defendants can get with the prosecutors and can obtain their discovery. They're all excellent attorneys. And they'll all do that. And once they've obtained the discovery, they'll meet with their clients and they'll file appropriate motions, which will be heard on September 30th, which will still be well in advance of the trial date, which will give everyone ample time to then evaluate the case, after the motions have been heard and ruled on. So given the fact that we can't get a three-defendant capital case that's still in the arraignment stage to trial any earlier than February, there's plenty of time for your attorneys to meet with the prosecutors, get the discovery, meet with the clients, file motions, argue motions. Just because he hadn't done it yesterday, because you want him to have it done yesterday, doesn't mean that he's not working on your case diligently and properly. He'll have everything done well in advance of the next Court date. And so, you know, he may not do it the very moment you want it done, but you're going to have to work with him on that because there's ample time for him to get it done.
... When the pre-trial motions hearing convened on September 30, 1994, all defense attorneys involved in the case requested a continuance until November 14, 1994 so that additional pre-trial motions could be filed....
*278 Because the trial judge had received "an abundance of correspondence from both Mr. Montgomery and Mr. Carruthers expressing concern about the pretrial investigation that has been conducted by their attorneys," the defendants were brought into open court and advised of the continuance. The trial judge then asked the attorneys to "state, for the record, the work that they've done and the work they intend to continue doing on behalf of their client." Each team of defense lawyers reported to the trial judge on the work that had been completed and on the work they intended to complete in the following days.
... Nance admitted that "some enmity" had developed between him and Carruthers, but indicated that he believed the problem could be resolved.
Carruthers also was allowed to voice his complaints about his attorneys on the record, and his primary complaint was that his attorneys had not met with him as often as he had expected. After hearing the comments of both Nance and Carruthers, the trial judge concluded as follows:
in my opinion, what has been done thus far in this case, given the fact that there are still six more weeks before the next motion date, and then a full three months beyond that before the trial date, is appropriate and well within the standards of proper representation.
...
On November 14, 1994, Carruthers filed his first motion for substitution of counsel....
Although the record does not reflect that a hearing was held, the trial court allowed Nance to withdraw from representing Carruthers on December 9, 1994. According to statements made by the trial court at a later hearing, Nance was allowed to withdraw because of "personal physical threats" made by Carruthers that escalated to the point that Nance did not "feel comfortable or safe, personally safe, in continuing to represent Mr. Tony Carruthers."
Coleman Garrett was appointed to replace Nance and represent Carruthers along with Morton [another attorney who had been appointed to assist Nance]. The trial judge also authorized James Turner, a third attorney, to assist the defense as an investigator.... On May 5, investigator/attorney James Turner was allowed to withdraw because he was a solo practitioner and could not maintain his practice and effectively perform the investigation needed on the case. However, the trial court appointed another attorney, Glenn Wright, to act as investigator....
On June 23, 1995, Garrett, Morton, and Wright sought and were granted permission to withdraw by the trial court. The record reflects that Carruthers also filed a motion for substitution of counsel. At a hearing on July 27, 1995, the trial court appointed William Massey and Harry Sayle to represent Carruthers. During this hearing, the trial judge commented as follows:
All right. I understand that these three defendants are on trial for their lives and that these are the most serious of charges and that they are all concerned that they are well represented and properly represented, and it's everyone's desire to see to it that they are well represented and properly represented. And toward that end, efforts are being made that they are represented by attorneys that have enough experience to handle this type of case and by attorneys that can establish a rapport with their clients *279 that would allow them to represent their clients well.
We have gone through several attorneys now in an effort to accommodate the defendants' requests in that regard, but at some point-and in my opinion, each of the attorneys and each of the investigators that has represented these defendants that has been relieved have been eminently qualified to do the job, but I have allowed them to be relieved for one reason or another.
I want the record to be perfectly clear at this point because of some suggestions that have already been raised by some of the correspondence that I have received from Mr. Carruthers, and all of it, by the way, will be made a part of the record. But Mr. Carruthers has suggested, in his correspondence, that some of the previous attorneys have been relieved because they weren't capable or competent to do the job. And that is, in my opinion, at least-my humble opinion as the judge in this case-absolutely and totally an inaccurate statement. The attorneys that have been relieved thus far have been fully capable and fully competent and had been doing an outstanding job, but for a variety of reasons, I've allowed them to withdraw from the case.
...
Mr. Carruthers has raised, through his correspondence, and apparently through direct communication with his previous attorneys, certain matters that are pretty outrageous suggestions, but because of the nature of the matters that he's raised, the attorneys that represented him previously felt that an irreparable breach had occurred between their ability-between Mr. Carruthers and themselves-[a]ffecting their ability to continue to represent them. And at some point-and that could well have been the point, but it wasn't. But at some point these matters that are raised by the defendants cannot continue to be used to get new counsel because it gets to be a point where they're-it's already well beyond that point, but, obviously, at some point, gets to the point where they're manipulating the system and getting what they want-Mr. Carruthers, sit still, please, or you can sit back there-gets to the point where they're manipulating the system and getting trial dates and representation that they want and are calling the shots. That's another matter that's been raised by Mr. Carruthers in some of his correspondence, that he wants his attorneys to know that he's the man calling the shots in this case, and he's the man to look to.
Well, of course, again, it's a free country, and he can say whatever he wants, and he can think whatever he wants, but as far as I'm concerned-and this applies to all three defendants and any defendants that come through this court that are represented by counsel-and this gets back to what Mr. McLin alluded to earlier-the attorneys are calling the shots in this case. They are trying the case except for certain areas where the defendant has the exclusive and final say, such as areas of whether he wants to testify or not and that sort of thing. The attorneys are in here representing these clients and will do so to the best of their ability. They are the ones who have been to law school. They are the ones that have been through trial many times before, and they're the ones that are here for a reason, and that reason is to represent these individuals. And, so you *280 know, if there's a conflict between the attorney and client with regard to how to proceed in the case, you all resolve it as best you can, but ultimately the attorney is trying the case. And, you know, we don't pull people in off the sidewalk to try these cases, and the reason we don't is because of certain things that they need to learn and certain experiences they need to have professionally before they're prepared to try these cases. So they're here for that reason and for that purpose.
...
So that gets me to the reason for our being here. Because of the matters raised by Mr. Carruthers, I have granted the request of his previous two attorneys and investigator reluctantly because, in my opinion, they were doing an outstanding job of representing Mr. Carruthers and his interests.
...
Because of the most recent rash of allegations raised by Mr. Carruthers in his many letters that he's sent me-I assume he's sent copies of the letters to his counsel and to others, but I've certainly got them, and they will be made a part of the record. And because of the types of things he alleged in those letters and the position that it put his previous attorneys in, and their very, very strong feelings about not continuing to represent Mr. Carruthers under those circumstances, I have reluctantly agreed to let them withdraw.
And in an effort again to get attorneys who I'm satisfied have the experience and the willingness to handle a case of this seriousness, I have approached and am inclined to appoint Mr. Harry Sayle ... and Mr. Bill Massey, to represent Mr. Carruthers.
...
And as I have stated, I'm running out of patience with regard to these different issues-and I use that word advisedly-being raised by the clients with regard to any objections they have with regard to their attorneys. And as far as I'm concerned, these are the attorneys that will represent these men at trial. It's going to have to be one gigantic conflict-one gigantic and real proven, demonstrated conflict before any of these men will be relieved from representation in this case. There will be no more perceived conflicts, no more unfounded, wild allegations raised through correspondence, no more dissatisfaction with how my attorney is handling my case for anybody to be relieved in this case.
These are the attorneys, gentlemen. You either work with them or don't. It's up to you. But they're the men that are going to be representing you at trial.
... Massey requested and was afforded a trial continuance until January 8, 1996. Like previous counsel, Massey and Sayle filed many pre-trial motions on behalf of Carruthers. By November 17, 1995, Massey informed the trial court that all necessary and appropriate pre-trial motions had been filed.
However, about a month later, on December 19, 1995, Massey filed a motion requesting permission to withdraw as counsel. As grounds for the motion, Massey stated that his relationship with Carruthers had "deteriorated to such a serious degree that [counsel] can not provide effective assistance as required by state and federal law.... Counsel's professional judgment cannot be exercised solely for the benefit of Defendant, as counsel fears for his safety and those *281 around him." Attached to the motion were several letters Carruthers had sent to Massey, both at his home and at his office in late November and early December of 1995. In the letters, Carruthers accused Massey of lying, and of being on drugs, threatened counsel, and expressed overall dissatisfaction with counsel's handling of the case. Massey made the following statements to the trial court at the hearing on his motion to withdraw:
I would just say that in 15 years of practicing law, I have never ever made a motion of this nature. I have never-I've never found it difficult to advocate on behalf of a case. I wouldn't find it difficult to advocate on behalf of this case. I do at this point, however, find it very difficult to advocate on behalf of Mr. Carruthers. And that is simply because he's made it that way. If I were receiving letters that merely stated I was incompetent and that I wasn't handling his case right, and those type of letters-we all get those time to time-I don't mind those. Those don't bother me. When I have letters that come to me that are threatening, when I have telephone calls that come to my office that are threatening the safety of me and my staff and those around me, I have real problems with that. It's gotten so bad, your Honor, that my secretary is having nightmares. The last call Mr. Carruthers made is Exhibit E to this verified motion. She called me in absolute tears crying uncontrollably, hysterically crying over his antics. That's the same way he's been doing me. I just haven't broken down and started crying about it. But I do have very, very strong, such strong personal reservations as I have never experienced before as an advocate....
... Despite Massey's argument, the trial judge denied Massey's motion, stating as follows:
With regard to Mr. Massey's concerns, I certainly believe that everything Mr. Massey has stated in his motion is factually accurate and correct. I don't have any reason to doubt that his secretary received the phone call that she says she received in the memo she prepared, or that any of these other things transpired. But I do think and I do agree with Mr. Massey's characterization that these efforts by Mr. Carruthers are a part of an overall ploy on his part to delay the case forever until something happens that prevents it from being tried.
...
In my opinion, to try to make the record reflect as clearly and accurately as possible the fact that the system is doing everything it can to make sure that Mr. Carruthers is properly and thoroughly represented in this case.... The system has done all it can, in my opinion, to make sure that Mr. Tony Carruthers is well represented. And I've tried to be as patient as I can be in listening to the concerns of defense counsel and investigators in making sure that no conflict existed in the representation of either of these men. The specific reasons, the narrow specific reasons for the excusal of the previous attorneys and investigators differ a little bit from those complaints that Mr. Massey has raised today....
... The trial court also emphasized that Carruthers' ploy had become more apparent over the course of the proceedings.
...
On January 2, 1996, six days before the trial was scheduled to begin, Massey *282 renewed his motion to withdraw. Massey informed the trial court that he had continued to receive threatening letters at his home and was concerned for his daughter's safety because Carruthers had described the car she drove. Massey indicated that he cared more about Carruthers' right to a fair trial than did Carruthers himself, but given the recent and ongoing threats, Massey declared, "I don't want to represent this man. I can't represent him. I won't represent him."
...
... The trial court then ruled on Massey's motion to withdraw, stating as follows:
Now, this is the way that the case is going to proceed on Monday. Mr. Massey is still on the case. He still represents Mr. Carruthers. If between now and Monday Mr. Carruthers chooses to discuss with Mr. Massey the case and to cooperate with Mr. Massey in his preparation of the defense in this case, then I'll look to Mr. Massey to go forward in representing Mr. Carruthers. ... And I would hope that Mr. Carruthers would between now and Monday, work with Mr. Massey and Mr. Sayle in preparation for a trial. If Mr. Carruthers elects not to, however, he will go forward representing himself.... And in my judgment, the only option that is still available if Mr. Carruthers chooses not to work with Mr. Massey and Mr. Sayle in going forward with this case next Monday, is for him to represent himself. And I'll provide him with a copy of the rules of Tennessee procedure, the rules of evidence. And he can sit at counsel table and voir dire the jury, and question witnesses, and give an opening statement, as any lawyer would, and he would be required to comply with all the rules as any lawyer would, if he chooses to go forward on his own. If he chooses to say nothing, then that's his prerogative, and-But that's what the situation will be next Monday, Mr. Carruthers. And the choice is yours. Again, the choice is yours .... If you go forward representing yourself, I will require Mr. Massey and Mr. Sayle to be available as elbow counsel so that at any recess or overnight, you can seek advice from them, and they can confer with you and advise you in any way that they deem appropriate....
The record reflects that at a hearing held the next day, January 3, 1996, Carruthers was "glaring" at Massey while "gritting his jaw." Upon observing Carruthers' conduct, the trial court once again cautioned the defendant as follows:
And again, as I did yesterday, I want to remind Mr. Carruthers that if it is his decision not to proceed with Mr. Massey and to proceed pro se-just a minute. I'll let you speak in a moment-then he needs to understand that he will be held to the same standard that attorneys are held to during a trial. Rules of evidence, rules of procedure will apply. And he will need to familiarize himself as best he can with those procedures and those rules between now and trial date because in proceeding pro se, he will certainly be held to that same standard. Obviously, he realizes the charges that are pending and the potential for the imposition of the death penalty involved in this case. We've had numerous hearings and motions over the past fifteen or eighteen months, and all of those matters should be very apparent to Mr. Carruthers at this point in time.
*283 Responding to the trial court's admonition, Carruthers said he did not want Massey representing him because Massey was on cocaine.
Following this hearing, Massey filed an application for extraordinary appeal in the Court of Criminal Appeals challenging the trial court's ruling that he remain on the case either as counsel or as advisory counsel. In an order dated January 8, 1996, the Court of Criminal Appeals held that Massey should be allowed to immediately withdraw from further representation....
The same day this order was filed, but before the trial judge had received the order, a hearing was held in the trial court. After learning that Massey had received seven more pieces of certified mail at his home since the hearing on January 2, and after being advised by Massey that the difficulties with Carruthers had not improved, the trial judge concluded that Carruthers,
through his actions, through his accusations, and letters, he has forced himself into a situation where I have no option but to require that he proceed pro se. And so in deference to your request, I will go forward with my previous statement and that is that you and Mr. Sayle will remain as elbow counsel. Mr. Carruthers will represent himself.
...
Upon hearing the trial court's ruling, Carruthers claimed that he had attempted to reconcile with Massey and complained that he was not qualified to represent himself. The trial judge responded [by reiterating that Carruthers had brought the situation upon himself].
After the trial court ruled, Carruthers offered to waive any conflict, to allow Massey to continue representing him, to apologize to Massey, and to testify that the accusations he had made against Massey were untrue. The trial court refused, finding that Carruthers was merely using another tactic to delay the proceeding.
The next day, January 9, 1996, the Court of Criminal Appeals entered an addendum to its previous order and allowed Massey to be completely relieved from further representation or participation in the case including providing assistance as "elbow counsel." However, Sayle continued on the case as elbow or standby counsel.
Id. at 534-44 (several alterations in original) (footnotes omitted).
The trial was ultimately delayed until April 15, 1996, after the State requested a continuance for reasons unrelated to Carruthers's self-representation. Id. at 544. In February 1996, the trial court allowed Sayle to withdraw as elbow counsel after his relationship with Carruthers further deteriorated. Id. at 545. Between early January and April 1996, the trial court denied Carruthers's five motions to appoint new counsel, id. at 544-45, and Carruthers represented himself during the guilt and sentencing phases of trial, id. at 545. The trial court did not appoint new counsel until Carruthers's motion-for-new-trial proceedings. Id.
In his direct appeal, Carruthers argued that the trial court's forcing him to represent himself violated the Fourteenth Amendment's Due Process Clause. See id. at 545-46. The Tennessee Supreme Court rejected this constitutional argument on the merits:
Both the United States and Tennessee Constitutions guarantee an indigent criminal defendant the right to assistance of appointed counsel at trial. The right of an accused to assistance of counsel, however, does not include the right to appointment of counsel of choice, or *284 to special rapport, confidence, or even a meaningful relationship with appointed counsel. The essential aim of the Sixth Amendment is to guarantee an effective advocate, not counsel preferred by the defendant.
Ordinarily, waiver of the right to counsel must be voluntary, knowing, and intelligent. Typically, such a waiver occurs only after the trial judge advises a defendant of the dangers and disadvantages of self-representation and determines that the defendant "knows what he is doing and his choice is made with eyes open." Many courts, however, have recognized that the right to counsel is not a license to abuse the dignity of the court or to frustrate orderly proceedings. Accordingly, several courts have acknowledged that, like other constitutional rights, the right to counsel can be implicitly waived or forfeited if a defendant manipulates, abuses, or utilizes the right to delay or disrupt a trial.
Some courts have attempted to distinguish the concepts of implicit waiver and forfeiture. These courts hold that an implicit waiver occurs when, after being warned by the court that counsel will be lost if dilatory, abusive, or uncooperative misconduct continues, a defendant persists in such behavior. In contrast, forfeiture results regardless of the defendant's intent to relinquish the right and irrespective of the defendant's knowledge of the right. Accordingly, where a defendant engages in extremely serious misconduct, a finding of forfeiture is appropriate even though the defendant was not warned of the potential consequences of his or her actions or the risks associated with self-representation.
However, many courts considering this issue do not distinguish between the two concepts and have used the terms implicit waiver and forfeiture interchangeably.
Although this Court has never considered the precise question presented in this appeal, when discussing a non-indigent defendant who fired his attorney in open court and thereafter repeatedly protested about going to trial without a lawyer, we recognized that even "[t]hough a defendant has a right to select his own counsel if he acts expeditiously to do so ... he may not use this right to play a 'cat and mouse' game with the court...." The idea that the right to counsel may not be used to manipulate or toy with the judicial system applies equally to indigent and non-indigent defendants. Although an indigent criminal defendant has a constitutional right to appointed counsel, that right may not be used as a license to manipulate, delay, or disrupt a trial. Accordingly, we conclude that an indigent criminal defendant may implicitly waive or forfeit the right to counsel by utilizing that right to manipulate, delay, or disrupt trial proceedings. We also hold that the distinction between these two concepts is slight and that the record in this case supports a finding of both implicit waiver and forfeiture.
When Garrett and Morton were allowed to withdraw and Massey and Sayle were appointed, the trial court advised Carruthers that Massey and Sayle would be the lawyers representing him at trial and that there would be no further withdrawal and new appointments absent a "gigantic conflict." Despite this admonishment, Carruthers once again launched personal attacks and threats against Massey, threats that eventually extended to Massey's office staff and family members. When Massey renewed his motion to withdraw on January 2, 1996, the trial court specifically and clearly advised Carruthers that he had two choices-cooperate with Massey *285 or represent himself. Carruthers also was advised that if he chose not to cooperate with Massey and to represent himself, he would be required to comply with all procedural rules as if he were an attorney. The trial court repeated his admonishment at a hearing on January 3, 1996. Despite the trial court's clear warnings, quoted fully earlier in this opinion, Carruthers persisted with his attitude of hostility toward Massey, as is evidenced both by his "glaring" at Massey during the hearings and by the letters Massey received after those hearings. In our view, Carruthers implicitly waived his right to counsel, because, after being warned by the trial court that he would lose his attorney if his misconduct continued, Carruthers persisted in his misconduct.
In so holding, we reject Carruthers' claim that the warnings given him by the trial court were not sufficient to support a finding of implied waiver. The cases upon which Carruthers relies in support of this claim are inapposite because they involve explicit, voluntary waiver cases. We decline to hold that a trial court must provide extensive and detailed warnings when a defendant's conduct illustrates that he or she understands the right to counsel and is able to use it to manipulate the system. We conclude that an implicit waiver may appropriately be found, where, as here, the record reflects that the trial court advises the defendant the right to counsel will be lost if the misconduct persists and generally explains the risks associated with self-representation.
Even assuming the warnings given Carruthers were insufficient to support a finding of implicit waiver, however, we conclude that Carruthers' conduct was sufficiently egregious to support a finding that he forfeited his right to counsel. The circumstances culminating in the trial court's ruling have been fully summarized. Carruthers repeatedly and unreasonably demanded that his appointed counsel withdraw and that new counsel be appointed. Carruthers' demands escalated as his scheduled trial dates drew near. As the trial court recognized, the "ploy" to delay the trial became increasingly apparent with each new set of attorneys. In addition, Carruthers' conduct degenerated and his outrageous allegations and threats escalated markedly with each new set of attorneys. As the trial court emphasized, Carruthers was the author of his own predicament and sabotaged his relationship with each successive attorney with the obvious goal of delaying and disrupting the orderly trial of the case. Under these circumstances, the trial court was fully justified in concluding that Carruthers had forfeited his right to counsel. Indeed, in situations such as this one, a trial court has no other choice but to find that a defendant has forfeited the right to counsel; otherwise, an intelligent defendant "could theoretically go through tens of court-appointed attorneys and delay his trial for years."
As did the trial court and the Court of Criminal Appeals, we have carefully considered the ramifications of holding that an indigent criminal defendant in a capital case has implicitly waived and forfeited his valuable right to counsel. We are aware that both implicit waiver and forfeiture are extreme sanctions. However, Carruthers' conduct was extreme and egregious. The sanction is appropriate under the circumstances and commensurate with Carruthers' misconduct. We reiterate that a finding of forfeiture is appropriate only where a defendant egregiously manipulates the constitutional right to counsel so as to delay, disrupt, or prevent the orderly administration *286 of justice. Where the record demonstrates such egregious manipulation a finding of forfeiture should be made and such a finding will be sustained, even if the defendant is charged with a capital offense. Persons charged with capital offenses should not be afforded greater latitude to manipulate and misuse valuable and treasured constitutional rights.
Id. at 546-50 (alterations in original) (footnotes and citations omitted).
B.
The procedural history surrounding Carruthers's mental health during his criminal proceedings is also relevant to this appeal. Concerns about Carruthers's competence developed early in the proceedings. At the request of pre-trial counsel, a clinical psychologist evaluated Carruthers in December 1994. That psychologist concluded that Carruthers was competent to stand trial. Again in May 1995, a different psychologist determined that Carruthers had the mental capacity to stand trial.
Counsel did not further question Carruthers's competency until his state postconviction proceedings in 2004, when appointed counsel arranged for Carruthers to be evaluated by psychiatrist Dr. William Kenner. Kenner concluded that Carruthers suffered from bipolar disorder with hypomanic symptoms. Kenner further concluded that Carruthers had been incompetent to stand trial, that he remained incompetent to make decisions about his postconviction proceedings, and that his mistreatment of counsel "represented symptoms of [his mental illness]." Based on Kenner's report, counsel argued in Carruthers's postconviction petition that Carruthers had not been mentally competent in 1996.
However, Carruthers demanded that counsel not pursue any claim based on incompetency. Believing themselves nevertheless ethically bound to pursue the competency claim, counsel filed a petition for the appointment of a guardian ad litem to decide for Carruthers whether to move forward with the claim. In order to determine whether Carruthers was competent to waive his underlying competency claim, the state postconviction court appointed psychiatrist Dr. Stephen Montgomery. Montgomery drafted a report based on the lengthy medical records available after Carruthers refused to meet with him in person. Montgomery diagnosed Carruthers as suffering from antisocial, paranoid, and narcissistic personality disorders, as well as drug abuse and dependence, and opined that Carruthers retained the ability to make a rational choice regarding whether to waive any challenge to his competency at trial. Based on Montgomery's report and the other relevant record evidence, the state postconviction court concluded that Carruthers was competent to make the waiver decision and therefore denied the request to appoint a guardian ad litem.
In denying counsel's request to appoint a guardian ad litem, the postconviction court also directed counsel to "submit within thirty days the withdrawal and waiver" of Carruthers's incompetency claims. In response, Carruthers's counsel told the court that Carruthers had refused to sign a proposed pleading withdrawing and waiving the incompetency claim. Carruthers also submitted the following written statement to the court: "I do not wish to relieve any attorneys pre-trial or post-trial of any negligence for not having me tested before being forced pro se! about my competency to represent myself." The court noted that, after "[h]aving fought for the right to waive these claims," Carruthers "now specifically declines to waive" them, and concluded that "[a]ll claims in *287 the amended petition remain before the Court." Apparently Carruthers's position changed again at some point before the postconviction court issued its final decision, however. The court's opinion stated:
The petitioner and his counsel in this proceeding have chosen purposely not to raise any issues regarding the petitioner's mental state, possible insanity defense, or competency to stand trial or waive counsel. The Court has previously held that the petitioner is competent to waive such claims in this proceeding and by purposely not raising them in this proceeding he has waived these claims.
Carruthers made no further attempt to litigate any incompetency challenge until his federal habeas proceedings.[2]
C.
After the Tennessee Supreme Court rejected Carruthers's direct appeal, see Carruthers , 35 S.W.3d at 572, and the state courts denied both his petition for postconviction relief, see Carruthers v. State , No. W2006-00376-CCA-R3-PD, 2007 WL 4355481, at *1 (Tenn. Crim. App. Dec. 12, 2007), and his petition for state habeas relief, see Carruthers v. Worthington , No. E2007-01478-CCA-R3-HC, 2008 WL 2242534, at *1 (Tenn. Crim. App. June 2, 2008), Carruthers petitioned the district court for a writ of habeas corpus. Among other things, Carruthers argued that (1) he was denied his Sixth Amendment right to counsel at critical stages of the proceedings, in violation of United States v. Cronic , at the December 19, 1995, January 2, 1996, and January 3, 1996 hearings, which resulted in his being forced to represent himself at trial; (2) the trial court violated his Sixth Amendment right to counsel by compelling him to proceed pro se during trial; and (3) he was not competent to stand trial or represent himself in 1996.
The district court rejected each of Carruthers's constitutional claims. The court first reasoned that Carruthers procedurally defaulted his Cronic claim by failing to raise it in the state-court proceedings. The court rejected Carruthers's argument that ineffective assistance of his postconviction counsel constitutes cause for the procedural default under Martinez v. Ryan , 566 U.S. 1, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012).
The district court also held that Carruthers procedurally defaulted his incompetency claims by failing to adequately present them to the Tennessee courts. The court rejected as inconsistent with Sixth Circuit precedent Carruthers's argument that substantive competency claims cannot be defaulted. The district court also concluded that ineffective assistance of postconviction counsel cannot excuse the procedural default of Carruthers's competency claims under Martinez , and rejected Carruthers's miscarriage-of-justice argument.
Finally, applying the deference required by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the district court rejected Carruthers's Sixth *288 Amendment challenge to being forced to represent himself. The court noted that "[t]here is no clearly established Supreme Court precedent on the issue of implied waiver or forfeiture of the right to counsel based on a defendant's conduct and/or what, if any, warnings are constitutionally required." The district court held that the Tennessee Supreme Court's decision that Carruthers implicitly waived and forfeited his right to counsel "is [therefore] not contrary to or an unreasonable application of clearly established Supreme Court precedent," as would be required to grant relief under AEDPA. See 28 U.S.C. § 2254(d)(1).
Carruthers now appeals.
II.
A.
Carruthers has procedurally defaulted his Cronic claim, and he cannot show cause and prejudice to overcome the default. Carruthers admits that his counsel never claimed in state court that Carruthers suffered a per se violation of the Sixth Amendment when he was effectively unrepresented at the December 19, 1995 and January 2 and 3, 1996 hearings at which the state trial court decided he would be forced to represent himself. Tennessee limits state prisoners to one postconviction petition, absent three statutory exceptions that do not apply to Carruthers's Cronic claim. See Tenn. Code Ann. § 40-30-102(c) (2012). The Cronic claim is therefore unexhausted, but no state remedy remains available. Under these circumstances, the claim is procedurally defaulted, and a federal habeas court may not review the claim absent a showing of cause and actual prejudice, which is not present here. Hodges v. Colson , 727 F.3d 517, 529-30 (6th Cir. 2013).
The alleged ineffective assistance of Carruthers's postconviction counsel in not raising the Cronic claim does not establish cause for this procedural default. As a general rule, counsel's performance in state postconviction proceedings cannot constitute cause to excuse a procedural default, because there is no constitutional right to counsel in such proceedings. Coleman v. Thompson , 501 U.S. 722, 757, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). In Martinez , the Supreme Court announced a narrow exception to this rule: the ineffective assistance of postconviction counsel can establish cause to overcome the default of a claim of ineffective assistance of trial counsel "where the State effectively requires a defendant to bring [the ineffective-assistance-of-trial-counsel] claim in state postconviction proceedings rather than on direct appeal." Davila v. Davis , --- U.S. ----, 137 S.Ct. 2058, 2062-63, 198 L.Ed.2d 603 (2017) (citing Martinez ).
It is doubtful that the Martinez exception, which the Supreme Court has repeatedly characterized as a "narrow" one, e.g. , Davila , 137 S.Ct. at 2065, could apply to excuse a habeas petitioner's default of an underlying Cronic claim. But we need not definitively decide that issue because Carruthers cannot overcome Martinez 's second limiting factor. Tennessee law does not effectively require defense counsel to bring a Cronic claim on postconviction review, rather than on direct appeal. In Sutton v. Carpenter , 745 F.3d 787, 792 (6th Cir. 2014), we held that Tennessee defendants are "highly unlikely to have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal," but that decision was silent as to how Tennessee treats claims of total deprivation of counsel at critical pre-trial proceedings. Carruthers makes no argument that Tennessee effectively limits such Cronic claims to postconviction review. In fact, Carruthers in his brief admits that the denial-of-counsel issue could have been *289 raised in his direct appeal. At oral argument, Carruthers's counsel attempted to backtrack on this concession by arguing that, because Carruthers's motion-for-new-trial counsel was also his counsel on direct appeal, a conflict of interest precluded his direct-appeal counsel from raising the Cronic claim as a "dropped issue." However, because the attorney representing Carruthers during his motion for a new trial and on direct appeal did not represent Carruthers during the pre-trial proceedings at which Carruthers claims he was completely deprived of representation, no conflict precluded that attorney from raising the Cronic issue on direct appeal.
Thus, because Tennessee does not effectively require defendants to raise claims pertaining to total deprivation of counsel at pre-trial proceedings for the first time in postconviction review, Carruthers cannot use Martinez to overcome his procedural default. Furthermore, Carruthers's only alternative argument to excuse his procedural default of the Cronic claim is insufficient. At oral argument, Carruthers asserted for the first time on appeal that a claim of total deprivation of counsel at a critical stage in the criminal proceedings cannot be defaulted because it alleges structural constitutional error. Carruthers relies on Railey v. Webb , 540 F.3d 393 (6th Cir. 2008), for the contention that claims of structural constitutional error cannot be procedurally defaulted. In Railey , while analyzing a state prisoner's judicial-bias claim under 28 U.S.C. § 2254, we noted "that judicial bias is structural error, not susceptible to forfeiture (or harmless error analysis)." Id. at 399. Railey is inapposite. Forfeiture and procedural default are distinct concepts. Hodges , 727 F.3d at 540. Thus, proclaiming that a right may not be forfeited or waived does not necessarily mean the right may not be procedurally defaulted. See id. In addition, our statement in Railey pertained to an underlying judicial-bias claim and said nothing about Cronic claims. Carruthers therefore is unable to support his contention that claims based on deprivation of counsel at critical stages of criminal proceedings cannot be defaulted.
Carruthers never raised his Cronic claim in the state-court proceedings, resulting in procedural default for which Carruthers has not shown cause and prejudice. Therefore, the Cronic claim does not entitle Carruthers to habeas relief.
B.
Carruthers is also not entitled to habeas relief based on his claim that the state trial court deprived him of his Sixth Amendment right to counsel by compelling him to proceed pro se during his capital murder trial and sentencing. Because the Tennessee Supreme Court decided this constitutional challenge on the merits during Carruthers's direct appeal, see Carruthers , 35 S.W.3d at 533-52, the state court's decision is entitled to AEDPA deference under 28 U.S.C. § 2254(d). The decision was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent and was not based on an unreasonable determination of the facts.
The Tennessee Supreme Court's decision that Carruthers forfeited his right to counsel through his pre-trial "misbehavior" is not contrary to clearly established Supreme Court precedent. A state-court decision is "contrary to ... clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts."
*290 Williams v. Taylor , 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The Supreme Court has never addressed whether a criminal defendant may forfeit his right to counsel by effectively rejecting appointed counsel after filing complaints against and threatening multiple court-appointed attorneys. Thus, the state supreme court's decision that Carruthers forfeited his right to counsel through such conduct does not contradict U.S. Supreme Court precedent.
In particular, the Tennessee court's decision is not contrary to Argersinger v. Hamlin , 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972). In Argersinger , the Supreme Court held that the Sixth Amendment right to counsel applies to criminal defendants being tried for any offense, "whether classified as petty, misdemeanor, or felony." Id. at 37, 92 S.Ct. 2006. There, although the Court held that "absent a knowing and intelligent waiver, no person may be imprisoned for any offense ... unless he was represented by counsel at his trial," id. , because the case did not address whether forfeiture is possible, it does not foreclose the possibility that a criminal defendant may forfeit his right to counsel in circumstances like Carruthers's.
Additionally, it was not error for the Tennessee Supreme Court to take into account lower federal court opinions, many of which have held that a defendant may forfeit the right to counsel through misconduct, when making its decision. See Carruthers , 35 S.W.3d at 547-48. It is true that "AEDPA prohibits [a federal habeas court from using] lower court decisions in determining whether the state court decision is contrary to, or is an unreasonable application of, clearly established federal law." Miller v. Straub , 299 F.3d 570, 578-79 (6th Cir. 2002). However, nothing prohibits a state court from examining decisions of the lower federal courts when interpreting the Constitution in the first place.
The Tennessee Supreme Court's decision also was not an unreasonable application of clearly established Supreme Court precedent. AEDPA imposes a high bar before a federal court can find this sort of error in a state-court decision. "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter , 562 U.S. 86, 103, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). Given the lack of Supreme Court precedent on this issue, and considering the close interplay between the right to counsel and the right to self-representation, we cannot say that the state court erred so clearly as to entitle Carruthers to habeas relief.
Nothing in this opinion is intended to bless the state trial court's actions or the merits of the Tennessee Supreme Court's opinion affirming those actions. Despite Carruthers's mistreatment of his own counsel, it is still troubling that the state trial court, after several hearings at which Carruthers was effectively unrepresented, required Carruthers to proceed pro se through his capital murder trial without giving him the warnings typically required in the distinct context of a defendant's affirmatively waiving his right to counsel. We usually require federal district courts to conduct a formal inquiry before allowing a defendant to voluntarily waive his right to representation. King v. Bobby , 433 F.3d 483, 492 (6th Cir. 2006). At the very least, a defendant must "be made aware of the dangers and disadvantages of self-representation" before waiving his right to counsel.
*291 Swiger v. Brown , 86 Fed.Appx. 877, 880 (6th Cir. 2004) (quoting Faretta v. California , 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ); see also King , 433 F.3d at 493. Formal warnings of this sort did not occur here. All the state court did to warn Carruthers about the effect of "choosing" to represent himself by refusing to cooperate with Massey was tell Carruthers that he would be expected to abide by Tennessee's rules of evidence and procedure. However, no clearly established Supreme Court precedent dictates that formal warnings are required, even in the context of a defendant's waiving his right to counsel, see Swiger , 86 Fed.Appx. at 881-82, as would be required to overturn the state court's decision under AEDPA.
Finally, the Tennessee Supreme Court's decision rejecting Carruthers's right-to-counsel claim was not based on an unreasonable determination of the facts. Carruthers attacks the state court's opinion for relying on unsupported facts. In particular, Carruthers contends that, because holes exist in the record regarding why his first appointed counsel, Larry Nance, and his second group of appointed attorneys, Garrett, Morton, and Wright, were dismissed, the Tennessee Supreme Court's decision was based on a distorted record. Under § 2254(d)(2), these arguments entitle Carruthers to relief only if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."
The state court did not unreasonably interpret the facts in the record before it regarding why Nance was removed as counsel. When describing Nance's removal, the court noted that "the record does not reflect that a hearing was held," then quoted from a transcript of a later hearing before the trial court: "According to statements made by the trial court at a later hearing, Nance was allowed to withdraw because of 'personal physical threats' made by Carruthers that escalated to the point that Nance did not 'feel comfortable or safe, personally safe, in continuing to represent Mr. Tony Carruthers.' " Carruthers , 35 S.W.3d at 535. However, at a later, postconviction hearing, Nance testified that he never felt personally fearful of Carruthers. Furthermore, while Nance testified that his attorney-client relationship with Carruthers deteriorated after Carruthers started refusing his visits, Nance never filed a motion to withdraw before the trial court informed him he was being relieved. Rather, the trial court was acting on Carruthers's motion for Nance's removal when it allowed Nance to withdraw as counsel.
Despite the fact that the statements quoted by the Tennessee Supreme Court about Nance's receiving personal threats and fearing for his safety were contradicted by Nance's later testimony, the state court's assessment was not unreasonable in light of the evidence before it at the time. The only evidence the state supreme court had about the reason for Nance's removal came from the trial court's description at a later hearing; Nance's postconviction testimony that contradicts the trial court's description was not available to the Tennessee Supreme Court when it decided Carruthers's direct appeal. Furthermore, even if the state court somehow unreasonably interpreted the record before it, any erroneous statement of the facts surrounding Nance's removal did not affect its ultimate decision. The true facts-that Carruthers had Nance removed as counsel after baselessly refusing to meet with Nance and then claiming Nance was ineffectively representing him-still support the Tennessee Supreme Court's view that Carruthers was manipulating his right to counsel to delay trial *292 proceedings. Thus, a misstatement by the Tennessee Supreme Court in this regard does not provide grounds for habeas relief.
The same is true for Carruthers's arguments surrounding Garrett's, Morton's, and Wright's removal. The only record evidence of these attorneys' removal is the state trial court's "order substituting counsel" from July 27, 1995, which grants Carruthers's request to substitute his appointed counsel but does not discuss the underlying reasons for the substitution. The trial court also made vague references at later hearings about how Carruthers's request to substitute these attorneys was part of his overall "ploy" to delay trial. The Tennessee Supreme Court did not infer anything about the reason for Garrett's, Morton's, and Wright's removal beyond what this evidence suggests.
In sum, given AEDPA deference, Carruthers is not entitled to habeas relief under § 2254 based on his claim that the state trial court unconstitutionally deprived him of the right to counsel by requiring him to represent himself during the capital murder trial.
C.
Carruthers has procedurally defaulted his competency claims and cannot establish cause and prejudice for the default. Carruthers never adequately argued to the Tennessee courts that he was not competent to stand trial or represent himself, as required to exhaust these claims under 28 U.S.C. § 2254(b). Carruthers admits he never presented these arguments to the state trial or appellate courts, and he abandoned the arguments during his state postconviction proceedings. Because Tennessee limits state prisoners to one postconviction petition for relief absent exceptions that do not apply here, see Tenn. Code Ann. § 40-30-102(c), no state remedy remains available, and Carruthers has procedurally defaulted his competency claims.
Hodges v. Colson , 727 F.3d 517 (6th Cir. 2013), forecloses Carruthers's argument that his competency claims could not be procedurally defaulted. In Hodges , we recognized that the Sixth Circuit is not among those courts to have adopted such a rule, and we held that "substantive competency claims are subject to the same rules of procedural default as all other claims that may be presented on habeas." Id. at 540. This holding makes clear that Carruthers could, and in this case did, default his competency claims.
Hodges also prevents Carruthers from relying on the alleged ineffective assistance of his postconviction counsel to overcome this procedural default. In Hodges , we held that a habeas petitioner may not rely on ineffective assistance of postconviction counsel to excuse default of an underlying substantive competency claim. See id. Thus, the Martinez exception does not allow Carruthers to show cause through ineffective assistance of his postconviction counsel.
Finally, Montgomery v. Louisiana , --- U.S. ----, 136 S.Ct. 718, 193 L.Ed.2d 599 (2016), does not require us to overturn Carruthers's conviction, regardless of AEDPA, if he was convicted while incompetent to stand trial or represent himself. Montgomery involved direct Supreme Court review of state-court collateral proceedings. The case does not address procedural default in federal habeas cases under AEDPA. In Montgomery , the Supreme Court held that the U.S. Constitution requires state collateral-review courts, in addition to federal habeas courts, to give retroactive effect to new substantive rules of federal constitutional law. See id. at 729 (quoting Penry v. Lynaugh , 492 U.S. 302, 330, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) ). Substantive constitutional rules *293 include "rules prohibiting a certain category of punishment for a class of defendants because of their status or offense." Id. Under Carruthers's argument, Montgomery dictates that every time a federal or state court reviews a conviction that violates a substantive rule of federal constitutional law, the court must invalidate the conviction. However, Montgomery 's holding is not so broad; Montgomery and Teague v.Lane , 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), together require courts to apply new substantive rules of constitutional law retroactively when otherwise properly presented. Id. at 732. Montgomery does not provide a new exception to federalism-based limits on habeas review under AEDPA.
Because Carruthers has not shown cause and prejudice to overcome his procedural default, he is not entitled to habeas relief on his competency claims.[3]
III.
The judgment of the district court is affirmed.
JANE B. STRANCH, Circuit Judge, concurring.
I join the opinion in full. I write separately to note my concern with a part of the Tennessee Supreme Court's analysis of implicit waiver or forfeiture of the right to counsel. The Court found Carruthers's conduct "extreme and egregious," and then explained its decision to compel Carruthers to proceed without counsel at his capital trial as an extreme but appropriate "sanction" that was "commensurate with Carruthers's misconduct." State v. Carruthers , 35 S.W.3d 516, 550 (Tenn. 2000). Though I believe the dividing line between intentional misconduct and manifestations of mental illness can be very difficult to draw, I recognize that courts may be called upon to make that determination. In those cases, judges must discern whether the facts reveal the intentionality of forfeiture or the blunder of mental illness. That is based on a finding of fact, one that entails serious consequences. The vocabulary of sanction does not have a place in that determination. I cannot agree that a criminal defendant may be denied his Sixth Amendment right to counsel as a form of punishment.

"[F]actual findings made by a state appellate court based on the state trial record" are presumed correct in federal habeas proceedings under 28 U.S.C. § 2254(e)(1). Mason v. Mitchell , 320 F.3d 604, 614 (6th Cir. 2003).

Carruthers submitted additional evidence challenging his competency to the district court below. This evidence includes: a lengthy social history prepared in 2011, which concluded that Carruthers's "actions and behaviors demonstrate that he is seriously mentally ill and emotionally disturbed and that he probably has significant organic brain damage;" a psychiatrist report from 2011, which opined that Carruthers was incompetent at the time of his trial, was not competent to represent himself, and was not competent to waive his mental health claims during the state postconviction proceedings; and a neuropsychologist report from 2011, which noted a number of abnormalities in different regions of Carruthers's brain that could cause diminished executive functioning, deficits in analytic processing, hyper-activity, reduced self-control, and impaired rational performance.

Carruthers argued to the district court that his procedural default should be excused under the miscarriage-of-justice exception, but did not renew that argument on appeal.